UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

IN THE MATTER OF THE SEARCH OF          )
ONE LG CELLPHONE S/N 504CYGW059015,      )
ONE SAMSUNG S5 CELLPHONE IMEI            )
353411065155154, ONE SAMSUNG            )
CELLPHONE IMEI 353424060697146, ONE      )
SAMSUNG S/N 99000467633832, ONE HTC      )     Case No. 2:16-MJ- 31
CELLPHONE S/N HT44CW901153, ONE          )
SAMSUNG S6 IMEI 990005886338236, ONE LG  )     TO BE SEALED
CELLPHONE S/N 011CYUK0063574, ONE        )
SAMSUNG CELLPHONE S/N R21C22R3ZME,       )
ONE QUE LITE CELL PHONE IMEI             )
35493906247731, ONE LG CELLPHONE S/N     )
509CYSF251366, ONE LG CELLPHONE S/N      )
S10CYXM1335610, ONE APPLE I-PHONE S/N    )
013974000872854, CURRENTLY IN LAW        )
ENFORCEMENT CUSTODY AT 510 ALLISON       )
STREET, MORRISTOWN, TENNESSEE 37814      )

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Allen Pack, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—seven electronic devices, described in Attachment A—which are currently in law enforcement possession, and the extraction from that property of electronically stored information, described in Attachment B.

2.      I am a Special Agent assigned to the Federal Bureau of Investigation ("FBI"), Johnson City, Tennessee, as a sworn Special Agent. I am an investigative or law enforcement

officer of the United States and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 21 of the United States Code.

3.     I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since October 2008. I am currently assigned to the Johnson City Office of the FBI.     During my time with FBI, I have been trained in the investigation of violations of numerous federal criminal statutes, to include violations of the controlled substance laws under Title 21, United States Code, Sections 841 and 846, and money laundering violations under Title 18, United States Code, Section 1956.

4.     During my training and experience as a law enforcement officer, I have assisted other agents during narcotics trafficking and money laundering investigations. My work in these investigations has given me experience in the use of a variety of surveillance techniques, undercover agents, confidential informants, and video and audio recording techniques. I have also learned the methods narcotics traffickers use in the sale and importation of narcotics from other locations within the United States and Mexico and the methods used by traffickers to conceal their assets and launder their illegal money. I have also learned that narcotics trafficking is a business usually run in a similar way to how legitimate legal businesses operate. I have learned the manner in which narcotics traffickers operate, the types of documents and records maintained in the course of said operations, and the use of other forms of items and/or contraband they use to run their illegal business.

5.     As a result of these investigations and prosecutions, I have become aware of various methods and techniques utilized by individuals within the Eastern District of Tennessee and elsewhere in order to sell and distribute various controlled substances. I have become familiar with various codes, slang terms, and other terminology utilized by individuals within

the Eastern District of Tennessee to refer to controlled substances. I am aware that drug traffickers often "front" drugs, or distribute them without receiving immediate payment. I have consistently kept myself abreast of various narcotic violators and have received intelligence regarding narcotics violations from agents of the , FBI, DEA, and local law enforcement authorities located in the Northeastern portion of the Eastern District of Tennessee and surrounding states.

6. Based on my prior training and experience stated herein above, as well as information obtained during this particular investigation, I know:

a. Individuals who deal in the sale and distribution of controlled substances often use cell phones or public or private telephone systems to communicate with each other to facilitate their illegal operations. These individuals often communicate by voice or text messages on cell phones to help further the illegal drug efforts. I have often found that upon arrest, the cell phones of suspects have saved messages or previous calls received or dialed which are linked to the illegal drug operations and other individuals involved in the illegal operations. These individuals also maintain contact lists on cell phones of their associates and customers. I have also found that cell phones of suspects that have photo capability, often have saved images of associates of illegal drug operators or of the cell phone owner or user.

b. Based on my experience and education, I am aware of the basic concepts of electronically or digitally storage information on computers and cell phones. I am aware that cell phones are used to store data, including photographs, text messages, telephone numbers, phone book information, and messages sent or received with dates and times of message, telephone numbers received or called with dates and times of calls, and all recorded voice messages. I am aware that users of cell phones often have phone contact lists stored on their personal cell

phones. I am also aware that cell phones store this data in memory chips or banks that can be retrieved with special equipment or by reviewing a menu of a particular cell phone. I am also aware that recently received or sent messages are stored on the cell phones of users and are normally kept until deleted or until a certain time has expired.

7.      Therefore, I know that it is common that cell phones seized from individuals who deal in the sale and distribution of controlled substances contain electronically or digitally stored data, including photographs, text messages, telephone numbers, phone book information, messages sent or received with dates and times of message, telephone numbers received or called with dates and times of calls, and recorded voice messages related to the conspiracy to distribute and to possess with the intent to distribute methamphetamine , a Schedule II controlled substance in violation of Title 21, United States Code, Sections 841(a)(1), 846, and 843(b).

8.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

9.      The property to be searched is and will hereinafter be referred to as the "Devices":

    a. LG cellular phone, S/N 504CYGW059015,

    b. Samsung S5 cellular phone, IMEI 353411065155154,

    c. Samsung cellular phone, IMEI 353424060697146,

    d. Samsung cellular phone, S/N 99000467633832

    e. HTC cellular phone, S/N HT44CW901153,

    f. Samsung S6, IMEI 990005886338236,

g.  LG cellular phone, S/N 011CYUK0063574,

h.  Samsung cellular phone, S/N R21C22R3ZME,

i.  Que Lite cellular phone,  IMEI 35493906247731,

j.  LG cellular phone, S/N 509CYSF251366,

k.  LG cellular phone, S/N S10CYXM1335610,

l.  Apple I-phone,  S/N 013974000872854

10.     The Devices are in the lawful possession of law enforcement and is currently located at 510 Allison Street, Morristown, Tennessee 37814.

11.     The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

12.     In March of 2015, the FBI began an investigation into a methamphetamine Drug Trafficking Organization (DTO) in the Hamblen County area of Tennessee.  Through multiple interviews and controlled methamphetamine purchases, the FBI learned of an individual named Lee McGoldrick, also known as Fluffy.  McGoldrick assisted numerous individuals in obtaining methamphetamine from one of his associates who resided in Stone Mountain, Georgia. McGoldrick took numerous individuals to Stone Mountain, Georgia a week and returned to the Eastern District of Tennessee with multiple ounces of methamphetamine for distribution.

13.     On November 23, 2015, a cooperating witness (herein after referred to as CW1) provided the following information:  An individual named Jeremy Spurling obtained ounce quantities of methamphetamine on a frequent basis to sell in the Eastern District of Tennessee.

Spurling's methamphetamine supplier was Lee McGoldrick. McGoldrick obtained the methamphetamine from an individual in Georgia.

14.     On December 9, 2015, a cooperating witness (herein after referred to as CW2) provided the following information: When CW2 first moved to Morristown, Tennessee, CW2 heard that Lee McGoldrick was the main methamphetamine supplier in town. McGoldrick's methamphetamine supplier was located out of town. In the past, CW2 had seen McGoldrick with a gallon size Ziploc back half full of methamphetamine.

15.     On January 11, 2016, a cooperating witness (herein after referred to as CW3) provided the following information: CW3 met Lee McGoldrick in the beginning of 2015. McGoldrick gave CW3 telephone number 865-223-2304. Beginning in August of 2015 to September of 2015, CW3 obtained large quantities of methamphetamine from Lee McGoldrick. McGoldrick had a methamphetamine supplier who was located in Stone Mountain, Georgia. CW3 knew him as Harry. CW3 was shown a picture of Harry Keilholtz and CW3 identified him as being McGoldrick's methamphetamine supplier. From August 2015 to September 2015, CW3 travelled with McGoldrick to Stone Mountain, Georgia every several days and purchased between three to five ounces of methamphetamine at a time from Keilholtz. CW3 gave law enforcement consent to search CW3's telephone. In CW3's telephone, text messages were found between CW3 and McGoldrick discussing traveling out of town to pick up methamphetamine.     Furthermore, CW3 used said cell phone to navigate to Stone Mountain, Georgia. CW3 used the Google Maps application in the cell phone. A search of Google Maps history on CW3's cell phone showed searches for Old Rockbridge Road, Stone Mountain, Georgia.

16.     On January 12, 2016, a cooperating witness (herein after referred to as CW4) provided the following information: CW4 obtained quantities of methamphetamine from Lee McGoldrick. In March of 2015, CW4 travelled with McGoldrick to an area near Atlanta, Georgia to meet with an individual named Harry to obtain methamphetamine. On this occasion, firearms were traded for methamphetamine. CW4 did not travel again to Georgia with McGoldrick until December 20, 2015. On this occasion, CW4 and McGoldrick travelled to the same location they had gone to previously and met with Harry. On this occasion, they purchased a half ounce of methamphetamine for $380.00.

17.     On January 14, 2016, a cooperating witness (herein after referred to as CW5) provided the following information: CW5 had been distributing methamphetamine for approximately a year and a half in the Morristown area of the Eastern District of Tennessee. CW5's methamphetamine supplier was Lee McGoldrick. McGoldrick obtained methamphetamine from an individual in Stone Mountain, Georgia named Harry. CW5 was shown a picture of Harry Keilholtz and CW5 identified him as McGoldrick's methamphetamine supplier. CW5 indicated he/she obtained ounce quantities of methamphetamine a month for distribution from McGoldrick and Keilholtz. CW5 and Linda Green (another methamphetamine distributor) would travel to Stone Mountain, Georgia weekly with McGoldrick to pick up methamphetamine from Keilholtz. CW5 gave law enforcement consent to search CW5's cellphone. The search of the phone revealed telephone number 865-223-2304 in the contact list under the name Fluffy (a known alias of McGoldrick). The search of the phone revealed text messages between CW5 and McGoldrick. Furthermore, CW5 used said cell phone to navigate to Stone Mountain, Georgia. CW5 used the Google Maps application in

the cell phone. A search of Google Maps history on CW5's cell phone showed searches for Old Rockbridge Road, Stone Mountain, Georgia.

18.     On January 14, 2016, CW3 conducted a controlled methamphetamine purchase from McGoldrick. On this occasion, CW3 contacted McGoldrick and arranged to purchase several grams of methamphetamine. The controlled purchase was audio recorded and surveilled by law enforcement. During the controlled purchase, McGoldrick told CW3 he could obtain smaller quantities of methamphetamine from an individual named Janae, but to obtain larger quantities they would have to go "down and get some". CW3 explained this meant they would have to go to Stone Mountain, Georgia to get it from Keilholtz like they had done in the past.

19.     Using the above information, law enforcement agents in Stone Mountain, Georgia took photographs of the residences on Old Rockbridge Road (this is a small road with only a few residences on it). Photographs of these residences were independantly shown to CW3, CW4 and CW5.     Of note, CW3, CW4 and CW5 do not know each other and never travelled to Stone Mountain, Georgia with McGoldrick together. CW3, CW4 and CW5 identified photographs of 5476 Old Rockbridge Road, Stone Mountain, Georgia as the residence of Keilholtz and the place where they travelled to with McGoldrick to obtain methamphetamine.

20.     Law Enforcement requested Keilholtz's criminal history. His criminal history revealed a felony conviction for distribution of methamphetamine in 2001 for which he was sentenced to 5 years in prison. Keilholtz also had an arrest in 2010 for possession of methamphetamine.

21.     A search of open source databases showed the utilities for 5476 Old Rockbridge Road, Stone Mountain, Georgia to be in the name of Keilholtz. Furthermore, a search of this database showed a telephone number of 404-202-7492 as being associated with Keilholtz.

22.     On January 26, 2016, law enforcement obtained a court order authorizing Verizon wireless, the provider for telephone 865-223-2304 (McGoldrick's phone), to provide law enforcement with toll records and cellsite information for 865-223-2304 from July 1, 2015 to September 30, 2015. On January 30, 2016, Verizon provided the records. A search of the toll records showed multiple communications between McGoldrick's telephone number and the number identified in paragraph 21 as belonging to Keilholtz (404-202-7492).

23.     An analysis of cell site information on telephone number 865-223-2304, showed that from July 1, 2015 to September 30, 2015, McGoldrick's phone departed East Tennessee and travelled to the Stone Mountain and Atlanta, Georgia areas and then returned to East Tennessee on the same day the following times (of note the trip from East Tennessee to Atlanta, Georgia is approximately five hours each way):

a.  7/4/2015

b.  7/10/2015

c.  7/12/2015

d.  7/14/2015

e.  7/18/2015

f.  7/23/2015

g.  8/17/2015

h.  8/23/2015

i.  8/29/2015

j.  9/1/2015

k.  9/2/2015

l.  9/4/2015

m. 9/6/2015

n. 9/7/2015

o. 9/11-912/2015: On this occasion, the cell phone stayed overnight in the Atlanta area.

p. 9/16/2015

q. 9/18/2015

r. 9/21/2015

s. 9/24/2015

t. 9/27/2015

24.     On January 20, 2016, law enforcement conducted surveillance at 5476 Old Rockbridge Road, Stone Mountain, Georgia. Two vehicles were parked at the residence. The license plates for the vehicles were PYG 1998 and QAZ 8930. These license plate numbers were queried with the Georgia Department of Motor vehicles and it was learned that both these vehicles were registers to Keilholtz.

25.     On February 11, 2016, a Federal search warrant was obtained in the United States District Court, Northern District of Georgia for 5476 Old Rockbridge Road, Stone Mountain, Georgia. On February 12, 2016, the search warrant was executed. When law enforcement arrived at the residence the following individuals were present on the property.

a. Harry Keilholtz

b. Linda Green

c. Beth Estes

d. Jason Helton

e. Jake Morgan

f. Peyton England

g. Moya Shields

When law enforcement was executing the search warrant one individual fled and was not detained by law enforcement. Subsequent interviews with Keilholtz, Green, and Estes revealed that the individual who fled was Lee McGoldrick.

26.     Pursuant   to   the   search   warrant,   approximately   one   kilogram   of methamphetamine was seized. Additionally items A-H referenced in paragraph 9 were seized. The items were identified as belonging to following individuals. Furthermore, the investigation had revealed the following regarding the owners:

   a. Item A:  This phone was identified as belonging to Jake Morgan. · Interviews conducted during the course of the investigation with McGoldrick and Estes revealed that Morgan was attempting to purchase a half ounce of methamphetamine from Keilholtz on February 12, 2016.

   b. Item B:  This phone was identified by Estes as belonging to her.  During the course of the investigation law enforcement has conducted two controlled methamphetamine purchases from Estes utilizing a confidential source.  The confidential source contacted Estes by phone in order to arrange the purchase.

   c. Item C-D:  Estes identified these items as belonging to Green.  During the course of the investigation law enforcement has conducted multiple controlled methamphetamine purchases from Green utilizing confidential sources.  The confidential sources contacted Green by phone in order to arrange the purchases.

   d. Item E:  Keilholtz identified this phone as belonging to him.  Keilholtz admitted to obtaining kilogram quantities of methamphetamine from a Hispanic male called Flacco.  Keilholtz admitted to selling the methamphetamine to individuals in East Tennessee.     During the search warrant at Keilholtz's residence

approximately a kilogram of methamphetamine was recovered by law enforcement. Keilholtz admitting to using this phone to communicate with McGoldrick and also to communicate with Flacco.

e. Item F: This phone was found next to a purse belonging to Moya. Inside this purse approximately a half ounce of methamphetamine was found. Moya indicated it was her cell phone.

f. Item G-H: Were found in the residence of Keilholtz. Their owners were not identified. The investigation has revealed that drug traffickers frequently have multiple cellular phones and regularly switch phones. Many times, when they switch phones their old phones still contain evidence of their drug trafficking in the form of old text messages, pictures, videos or contacts.

27. Following the search warrant, and upon being advised of and waiving his Miranda rights, Kielholtz told agents that he wanted to cooperate and would provide information about the individual who supplied him with drugs in the Atlanta area, an unidentified Hispanic male known as "Flacco." Kielholtz told agents that he had previously purchased half-kilogram quantities of methamphetamine from Flacco on numerous occasions and that Flacco and/or Flacco's associates had delivered methamphetamine to his residence at 5476 Old Rockbridge Road on multiple occasions.

28. At approximately 10:53 a.m., Kielholtz made a phone call to Flacco (using item D described in paragraph 26), during which Kielholtz asked for Flacco to deliver one (1) kilogram of methamphetamine to Kielholtz's residence. Flacco responded that he would call Kielholtz back in ten minutes. Approximately ten minutes later, Flacco called Kielholtz back and told Kielholtz that Flacco's brother would deliver the methamphetamine in two hours. At

approximately 12:50 p.m., Flacco called Kielholtz and said that "they" would arrive in about thirty minutes. Each of these phone calls were recorded and made in the presence of law enforcement agents. At no time did Flacco ask Kielholtz for the address where the methamphetamine should be delivered.

29. At approximately 1:20 p.m., a silver 2002 Infiniti FX45 pulled into and parked in the driveway of 5476 Old Rockbridge Road. A Hispanic male (later identified as Miguel Angel Padilla-Peña, a/k/a Martin Ramirez-Peña) was driving the silver Infiniti. Another Hispanic male (later identified as Jesus Carranza- Sanchez) was the passenger in the vehicle. Law enforcement observed Padilla exit the driver's side of the vehicle carrying a pink drawstring bag that appeared to be weighted down with an unknown item. Padilla walked directly to the front door of the residence and knocked on the front door. Immediately thereafter, law enforcement took Padilla in to custody. Carranza (who had stayed in the vehicle up that point in time) quickly moved from the passenger seat into the driver's seat and attempted to start the vehicle. Law enforcement converged on the vehicle and stopped him from fleeing. Carranza was placed into custody.

30. After being advised of their Miranda rights in Spanish, and waiving those rights, Padilla and Carranza gave statements to law enforcement. Padilla stated that he had been working for an individual known as "Joaquin" for the prior seven months delivering methamphetamine on a weekly basis. Padilla admitted that he would typically meet Joaquin in a public space (such as a strip mall); Joaquin would arrive in a taxi and hand over a package containing methamphetamine to Padilla and give Padilla directions to the location where the methamphetamine would be delivered; Padilla would deliver the methamphetamine and pick up the money; and then return to another public area to turn over the money to Joaquin. Padilla

stated that he did not know how much methamphetamine he typically delivered, nor at what price was the methamphetamine sold. Padilla stated that Carranza usually accompanied Padilla on the methamphetamine deliveries and that Carranza was the primary contact with Joaquin. Padilla said he typically earned $300 per methamphetamine delivery and that Carranza paid him.

31. Carranza stated that he had only been in the United States for one month. Carranza stated that he did not have a job and that he was just friends with "Martin" (Padilla). Carranza stated that he had agreed to go with Padilla to see a friend of Padilla's. Carranza stated that he did not know that Padilla had a bag with him, or that the bag contained drugs, until he saw law enforcement arrest Padilla.

32. Law enforcement weighed the crystal white substance hand delivered by Padilla and transported by Padilla and Carranza and found it to weigh approximately 1.14 kilograms. It field-tested positive for the presence of methamphetamine, a Schedule II controlled substance.

33. Both Padilla and Carranza stated that they were unlawfully present in the United States.

34. Items I-L described in paragraph 9 were found on Padilla or Carranza as described below:

> a. Item I: This item fell out of Carranza's lap when he was taken out of the vehicle after his attempt to flee and into the custody of law enforcement.
>
> b. Item J-K: These items were found on the person of Carranza.
>
> c. Item L: This item was found on the person of Padilla. Padilla identified it as being his.

35.     On February 12, 2016, at approximately 7:02 p.m., a criminal complaint was obtained in the Northern District of Georgia for the arrest of Padilla and Carranza for violations of Title 21 U.S.C. Sections 841(a) and 841(b)(1)(A). Padilla and Carranza were taken into law enforcement custody.

36.     Based upon all of the above, your affiant believes that probable cause exists to search the phones seized at 5476 Old Rockbridge Road, Stone Mountain, Georgia and from the arrest of Padilla and Carranza as described herein as they are likely to contain information relative to their involvement in methamphetamine distribution.

37.     Based on my education, experience, and investigation in this large scale drug trafficking organization involving the conspiracy to distribute and to possess with the intent to distribute methamphetamine, a Schedule II controlled substance, it is my opinion that the cell phones listed in Attachment A contain electronically or digitally stored data, including photographs, text messages, telephone numbers, phone book information, messages sent or received with dates and times of message, telephone numbers received or called with dates and times of calls, and recorded voice messages related to the conspiracy to distribute and possess with the intent to distribute methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 846, and 843(b).

38.     Based on my education, experience, and investigation in this large scale drug trafficking organization, I have learned that cellular telephones are regularly used to by methamphetamine distributors and purchasers to arrange their transactions. Furthermore, cell phones are used to take pictures of videos of their drug trafficking activities. The investigation has revealed that on many occasions drug traffickers maintain multiple cell phones and regularly switch cell phones and telephone numbers. Despite switching cell phones, the old cell

phones still maintain evidence of drug trafficking on the form of text messages, contact lists, photos or videos.

39. The Devices are currently in the lawful possession of the Hamblen County Sheriff's Office. They came into law enforcement's possession through the searches referenced herein. Therefore, while law enforcement might already have all necessary authority to examine the Devices, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Devices will comply with the Fourth Amendment and other applicable laws.

40. The Devices are currently in storage at 510 Allison Street, Morristown, Tennessee 37814. In my training and experience, I know that the Devices have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of law enforcement.

## TECHNICAL TERMS

41. Based on my training and experience, I use the following technical terms to convey the following meanings:

> a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice

communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory

cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable

storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

h. Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

42.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

43.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

44. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose

many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

45.     *Manner of execution.*  Because this warrant seeks only permission to examine the device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is a reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

46.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Allen Pack
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
On February 19th, 2016

CLIFTON L. CORKER
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

The following property is to be searched and will hereinafter be referred to as the "Devices":

    a.  LG cellular phone, S/N 504CYGW059015,

    b.  Samsung S5 cellular phone, IMEI 353411065155154,

    c.  Samsung cellular phone, IMEI 353424060697146,

    d.  Samsung cellular phone, S/N 99000467633832

    e.  HTC cellular phone, S/N HT44CW901153,

    f.  Samsung S6, IMEI 990005886338236,

    g.  LG cellular phone, S/N 011CYUK0063574,

    h.  Samsung cellular phone, S/N R21C22R3ZME,

    i.  Que Lite cellular phone,  IMEI 35493906247731,

    j.  LG cellular phone, S/N 509CYSF251366,

    k.  LG cellular phone, S/N S10CYXM1335610,

    l.  Apple I-phone,  S/N 013974000872854

The Devices are currently located at 510 Allison Street, Morristown, Tennessee 37814.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

Electronically or digitally stored data, including photographs, text messages, telephone numbers, phone book information, messages sent or received with dates and times of messages, telephone numbers received or called with dates and times of calls, recorded voice messages, and any other information related to the conspiracy to distribute and possess with the intent to distribute methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 846, and 843(b).